# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

MICHAEL A. CHIRCO and DOMINIC
MOCERI,

                    Plaintiffs,

v.

GATEWAY OAKS, LLC; ARROW
BUILDING CO., INC.; THE DESIGN GROUP
LLC; N&D DEVELOPERS, LLC; M.C.S.
ASSOCIATES, INC.; SALVATORE
SARAFINO; JOSEPH P. D'ANGELO; M.C.S.
ASSOCIATES, INC.; JIM JONES; and
CALVIN HALL, individually and d/b/a
CALVIN HALL and ASSOCIATES,

                    Defendants.

_____ /

Case Number:  02-CV-73188

JUDGE PAUL D. BORMAN
UNITED STATES DISTRICT COURT

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS

Now before the Court are Defendants' motions for summary judgment on Plaintiffs'

claims.  The Court heard oral argument on July 6, 2005.  Having considered the entire record,

and for the reasons that follow, the Court GRANTS the instant motions.

## I.  FACTS

On August 2, 2002, Michael A. Chirco and Dominic Moceri (collectively "Plaintiffs")

filed the instant action against Gateway Oaks, L.L.C. ("Gateway"), Arrow Building Co., Inc.

("Arrow"), The Design Group, L.L.C. ("Design"), N & D Developers, L.L.C. ("N & D"), Joseph

D'Angelo ("D'Angelo"), Salvatore Sarafano ("Sarafano"), M.C.S. Associates, Inc. ("M.C.S."),

Jim Jones ("Jones"), and Calvin Hall individually and d/b/a Calvin Hall and Associates ("Hall")

(collectively "Defendants"), alleging copyright infringement pursuant to 17 U.S.C. § 101 *et seq.*
Plaintiffs are in the business of developing, leasing and selling real estate, including
condominiums, apartments and single family homes, in the Detroit metropolitan area,
specifically in Oakland and Macomb County.  (Compl. at ¶ 15-16.)

Plaintiffs have previously worked with a third party architect, Ronald E. Mayotte &
Associates ("Mayotte"), to create technical architectural plans, and Plaintiffs have constructed
apartments/condominiums in accordance with these plans.  (*Id.* at ¶ 17-18.)  Specifically,
Mayotte and Plaintiffs originally collaborated to create architectural plans for an apartment
complex commonly known as the Manors at Knollwood ("Knollwood") in Macomb County,
Michigan.  (*Id.* at ¶ 19.)  In 1997, Mayotte obtained copyright registrations for both the
Knollwood architectural plans ("Knollwood plans"), U.S. Copyright Registration No. VAu 356-
238, and the Knollwood architectural buildings ("Knollwood buildings"), U.S. Copyright
Registration No. VAu 356-237.[1]  (*Id.* Ex. A.)

Plaintiffs and Mayotte subsequently collaborated to develop architectural plans for a
condominium project that is commonly known as Aberdeen Village ("Aberdeen"), located in
Sterling Heights, Michigan.  (*Id.* at ¶ 16, 18.)  Mayotte obtained copyright registrations for both
the Aberdeen architectural plans ("Aberdeen plans"), U.S. Copyright Registration No. VAu 356-
236, and the Aberdeen architectural buildings ("Aberdeen buildings"), U.S. Copyright

---

[1] In an earlier case involving different defendants, Plaintiffs conceded that the Knollwood
buildings' copyright registration was invalid because construction of the Knollwood buildings
began in late 1988, before the enactment of the Architectural Works Copyright Protection Act,
Pub. L. No. 101-650, Sec. 701, 104 Stat. 5089, which only applies to architectural works that
were created on or after December, 1, 1990, its date of enactment.  *See Chirco v. Hampton
Ridge*, L.L.C., No. 01-72015 (E.D. Mich Aug. 31, 2001) (Roberts, J.); 1 MELVILLE B. NIMMER
AND DAVID NIMMER, NIMMER ON COPYRIGHT § 2.20 (2003) (footnotes omitted).

Registration No. VAu 356-235. (*Id.* Ex. A.)  Plaintiffs allege that copyright law protects the Aberdeen plans and buildings as derivatives of the copyrighted Knollwood plans.[2]  (Compl. at ¶ 18-19.)

According to the affidavit of Charles F. Merz ("Merz"), Plaintiffs' expert, the Knollwood plans and the derivative Aberdeen plans and buildings contain several components that, when combined in the manner set forth in the plans and buildings, create an original arrangement of space:

8.     The Aberdeen plans describe a unique twelve unit residential building. There are four units on the first floor as well as two rows of six single car garages on the first floor one at each end of the building.  There are eight units on the second floor, of which 4 are over the garages.  Each of the four second floor units which are constructed over a garage are placed on three garages, which allows the building to be built as four distinct quadrangles with fire rated walls separating each quadrangle.  Pursuant to the unique plan, each of the twelve garages has direct access to its assigned residential unit without requiring the occupants to go outside or use a common hallway to access their units.

9.     One of the unique aspects of the Aberdeen condominiums is the way that it can occupy a site.  Because the garages are on the side of the building and because the garages of adjoining buildings face each other, the driveway orientation is quite compact, which allows the buildings to be spaced just sixty four feet from each other.  This allows relatively high density of the units, and an efficiency of infrastructure design and implementation, thus allowing significant cost savings for this work.

10.    Another unique aspect of the Aberdeen condominiums is their architectural features, including the way that both the front and back of the building are architecturally identical, allowing both to have an attractive visual appeal without the presence of garages or other elements typical of

---

[2]Supplemental Registrations that were filed in October of 2001 to remedy technical defects in the initial registrations identified the Aberdeen copyrights as derivatives of the Knollwood plans. (Compl. Ex. A., U.S. Copyright Registrations No. VAu 535-027 and VAu 535-028); *Chirco v. Hampton Ridge, L.L.C.*, No. 01-72015, at 15 (E.D. Mich. Sept. 24, 2002) (Order Adopting in Part and Denying in Part the Report and Recommendation of the Magistrate Judge).

the back side of multi-family buildings.

(Merz Aff. at ¶¶ 8-10.)  Along with the Knollwood plans and the Aberdeen plans and buildings, the Knollwood buildings also embody this arrangement of space, which is referred to as the "Knollwood building design."  (Merz Dep. at 51, 72; Gateway Br. at 4.)

In July of 1997, Mayotte granted Plaintiffs an exclusive license for the "use" of the Knollwood and Aberdeen plans.  The license agreement stated, however, that "no revisions to the . . . [p]lans or derivative works shall be made by any person other than Mayotte. If the . . . [p]lans require any modifications from time to time, then upon request by [Plaintiffs], Mayotte shall execute the modifications and shall be compensated on a time and materials basis at Mayotte standard rates. . . ."  (Moceri Aff. Ex. A.)  In September of 2001, the parties to the original license agreement entered into a confirmatory addendum.  (*Id*. Ex. B; August 6, 2003 Prelim. Inj. Hearing Tr. at 12.)  The agreement stated:

1.      The exclusive rights granted to [Plaintiffs] include the exclusive right to reproduce the . . . [p]lans, to distribute copies of the . . . [p]lans, to make derivative works based on the . . . [p]lans, provided such derivative works are created as set forth in Paragraph 3 of the Agreement, and to use the . . . [p]lans as the basis for any building.

2.      [Plaintiffs] have the right to sue to enforce any of their exclusive rights under the Agreement.

(*Id*.)

Plaintiffs have developed numerous condominium projects based upon the Knollwood and Aberdeen plans.  These include, for example, Aberdeen Gardens in Sterling Heights, Michigan; Glenmoor Village in Macomb Township, Michigan; Warwick Village in Macomb Township, Michigan; Aberdeen Pines in Sterling Heights, Michigan; Stratford Village in Sterling Heights, Michigan; and Oakmonte in Oakland Township, Michigan.

4

At issue in this case is a condominium project commonly known as Gateway Oaks that Defendants developed.  (Compl. at ¶ 22.)  The Plaintiffs' Aberdeen Pines condominium project in Sterling Heights, Michigan,[3] is adjacent to and surrounds Gateway Oaks.  (*Id.*)  Based upon their review of the Gateway Oaks plans filed with the Sterling Heights Building Department, Plaintiffs allege that the Gateway Oaks plans "are substantially similar to, and copy, the Aberdeen [p]lans and . . . [w]orks."  (*Id.* at ¶¶ 24-25.)  Plaintiffs, therefore, filed the instant action against Defendants for infringement of Plaintiffs' copyrighted Knollwood plans, Aberdeen plans, and Aberdeen buildings (collectively "copyrighted materials").  (*Id.* at ¶¶ 20, 32-33, 36.)

Count I of Plaintiffs' complaint sets forth a claim of copyright infringement against Gateway, Arrow, Design, and N & D.  Count II sets forth a claim of copyright infringement, pursuant to principles of vicarious liability, against D'Angelo and Sarafano.  Count III sets forth a claim of copyright infringement, under principles of contributory liability, against MCS, Jones, and Hall.

On August 27, 2002, Defendants Gateway, Arrow, N & D, D'Angelo, and Sarafano filed a Counterclaim against Plaintiffs, seeking a declaratory judgment, pursuant to 28 U.S.C. § 2201, *et seq.*, declaring the parties' respective rights under copyright law.  On September 11, 2002, Defendants M.C.S. and Jones filed a Counterclaim against Plaintiffs, also seeking a declaratory judgment, under § 2201, declaring the parties' respective rights under copyright law.

_____

[3] Plaintiffs' complaint does not allege infringement of this copyright; rather, the complaint only pleads infringement of the Knollwood plans, the Aberdeen plans, and the Aberdeen buildings.  Moceri confirmed this during his deposition.  (Def.'s Prelim. Inj. Resp. Br. Ex. 17, Moceri Dep. at 8, 107-08.)

On November 22, 2002, Plaintiff filed a motion for a preliminary injunction.  On August 28, 2003, the Court issued an opinion and order denying Plaintiffs' motion for a preliminary injunction.  The Court reasoned, in part, that a strong likelihood existed that either side could prevail on the ultimate issue of copyright infringement.  (August 28, 2003, Opinion at 34.)

On March 11, 2005, Plaintiffs filed a Re-Filed Motion for Summary Judgment Dismissing Defendants' Affirmative Defense that Construction of the Knollwood Building Turned the Building Design Over to the Public Domain.  On March 18, 2005, Defendants Design and Hall each filed a motion for summary judgment on Plaintiffs' claims against them.  Also on March 18, 2005, Defendant Gateway, on behalf of itself and Defendants D'Angelo, Sarafano, Arrow, and N & D, filed a motion for summary judgment on Plaintiffs' claims against them.

On April 29, 2005, the Court granted Plaintiffs' re-filed motion as to all of the Defendants except for Design.[4]  Applying the law-of-the-case doctrine, the Court rejected the affirmative defense that the Knollwood building design, as embodied in the Knollwood plans, is in the public domain.

Now before the Court are Defendants' motions for summary judgment on Plaintiffs'

_____

[4]Although Plaintiffs' renewed motion was directed at all of the Defendants, only Gateway filed a response.  Design's instant summary-judgment motion raises the same issue of whether the Knollwood building design is in the public domain because that design, as embodied in the Knollwood buildings, is not protected under the AWCPA.  In its opinion granting Plaintiffs' renewed motion, the Court noted that it would afford Design an opportunity to address this issue in its instant motion.  (April 29, 2005, Opinion at 14 n.7.)

While Gateway's instant summary-judgment motion again argues that the Knollwood building design is in the public domain because the AWCPA does not protect that design as embodied in the Knollwood buildings (Gateway Br. at iv, 4, 11-12; Reply at 2.), the Court's April 29, 2005, opinion rejected that argument such that the Court will not revisit it here.  The Court, likewise, will disregard any of Gateway's arguments to the extent that they hinge upon that erroneous contention. (*See* Gateway Br. at ii, 14, 20; Johnson Report ¶ 90, Tab 25.)

6

claims.

## II. ANALYSIS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material" fact is one "that might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A "genuine" issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In deciding a motion for summary judgment, the Court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.

Under the law-of-the-case doctrine, a court generally may not revisit an issue that it decided, whether expressly or by necessary implication from its disposition, at an earlier stage of the proceedings; rather, once a court has decided an issue, the court should usually give effect to that decision throughout that litigation. *In re Kenneth Allen Knight Trust,* 303 F.3d 671 (6th Cir. 2002). While the law-of-the-case doctrine is discretionary in that it does not limit the court's power to revisit a previously-decided issue, a court should exercise its power to reach a result that is inconsistent with a prior decision that it reached in the same case only sparingly and under extraordinary circumstances. *Id.* To do so, the court must find some cogent reason to show that

the prior ruling is no longer applicable, such as if the prior opinion was clearly erroneous or would work a manifest injustice. *Id.* An intervening change in controlling law between the date of the first ruling and the date that it is revisited would constitute such a cogent reason. *See Amen v. City of Dearborn,* 718 F.2d 789 (6th Cir. 1983).

An architectural work is "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings." 17 U.S.C. § 101. Before the enactment of the Architectural Works Copyright Protection Act, Pub. L. No. 101-650, Sec. 701, 104 Stat. 5089 ("the AWCPA"), which only applies to architectural works that were created on or after December 1, 1990, its date of enactment, physical buildings that were constructed based upon copyrighted architectural plans could not receive copyright protection. 1 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT § 2.20 (2003) (footnotes omitted). Copyright law, however, has long since afforded architectural plans, as distinct from buildings, protection as "pictorial, graphic, and sculptural works." 17 U.S.C. § 102(a)(5); *see Robert R. Jones, Assoc. v. Nino Homes*, 858 F.2d 274, 278 (6th Cir. 1988).

The statutory copyright protection in architectural plans does not protect the building depicted in those plans because the law before January 1, 1978, did not recognize such protection. *See* 17 U.S.C. § 113(b); *Robert R. Jones, Assoc.,* 858 F.2d at 278. As to the scope of copyright protection in architectural plans, the Sixth Circuit Court of Appeals has held that, although "one may construct a house which is identical to a house depicted in copyrighted architectural plans, . . . one may not directly copy those plans and then use the infringing copy to construct the house." *Robert R. Jones, Assoc.,* 858 F.2d at 280; *see Imperial Homes Corp. v. Lamont,* 458 F.2d 895, 899 (5th Cir. 1972) (holding that infringement of a copyrighted

8

architectural plan occurs upon the imitation or transcription of such plan "in whole or in part"). Moreover, "where someone makes infringing copies of another's copyrighted architectural plans," the copyright owner may recover damages that "include the losses suffered as a result of the infringer's subsequent use of the infringing copies"–e.g. the construction of a building based upon those copies.  *Robert R. Jones, Assoc.,* 858 F.2d at 280.

In this case, the Knollwood buildings are a development of fifty separate buildings, nineteen of which were constructed before December 1, 1990. (Resp. at 3. n.7; Moceri Dep. at 15.)  Consequently, Plaintiffs neither dispute that the Knollwood buildings are not entitled to copyright protection nor rely upon any such protection to support their claims.[5] (Resp. to Gateway at 5.) *See Chirco v. Hampton Ridge, L.L.C.*, No. 01-72015 (E.D. Mich) (Aug. 31, 2001, Stipulated Order) (J. Roberts) (conceding that the copyright registration for the Knollwood buildings is invalid).  Rather, the thrust of Plaintiffs' claims is that Defendants, via the Gateway Oaks plans, infringed the Knollwood building design, as embodied in the Knollwood plans and their derivative works.  (Compl. at ¶¶ 20, 24-25, 32-33, 36.)

### A.  Standing

As a threshold matter, Design maintains that Plaintiffs lack standing under 17 U.S.C. §

---

[5]Although Gateway, in its summary-judgment motion, asks the Court to issue a formal order invalidating the copyright registration of the Knollwood buildings, Vau 356-237, so as to notify the Copyright Office of its cancellation (Gateway Br. at 4-5, 8-9.), the Court declines to issue such an order because Plaintiffs have stipulated to the invalidity of the Knollwood buildings' copyright registration and because other courts have already issued orders regarding that registration.  (*See* Resp. to Gateway at 6.)

To the extent that Gateway, once again, asserts that the invalidation of the Knollwood buildings' copyright registration demonstrates that the Knollwood building design is in the public domain (Gateway Br. at 9, Reply at 2.), the Court's April 29, 2005, opinion forecloses that assertion.

501(b) on the ground that they are neither the owners nor the exclusive licensees of the

copyrighted materials. (Mot. at 1.)  17 U.S.C. § 501(b) provides, in pertinent part:

> The legal or beneficial owner of an exclusive right under a copyright is entitled,
> subject to the requirements of section 411, to institute an action for any
> infringement of that particular right committed while he or she is the owner of it.

Pursuant to the 1997 Agreement, Mayotte granted exclusive licenses in the copyrighted

materials to the following licensees: 1) Plaintiffs; 2) Knollwood Associates; 3) Aberdeen Village

LLC, and 4) Moceri Development Corporation. (Design Br. at 2; Ex. D.)  In 2003, MB

Properties received a license in the copyrighted materials to develop Riverwalk, an Aberdeen-

style development, in exchange for a license fee.[6] (Design Br. at 2; Moceri Dep. at 14-16, Ex. E).

Design asserts that § 501(b)'s bestowal of copyright standing upon a copyright owner's

"exclusive licensee" is limited to only a single such licensee.  (Design Br. at 5.)  Put another

way, Design argues that a copyright owner's grant of a license to more than one individual

destroys the exclusivity of any one license such that each licensee lacks copyright standing under

§ 501(b). (Design Reply at 1.)  Conceding that the Copyright Act does not define the term

"exclusive," Design maintains that, under the plain-meaning of that term, "exclusive" denotes

one or that which is not shared with another.  (Design Br. at 5; Reply at 2.)   Design underscores

that, here, the licensees of the copyrighted materials have equal rights to those licenses and, thus,

share the same bundle of rights with each other.  (Design Br. at 5-6, Reply at 2; Moceri Dep. at

21-16; Chirco Dep. at 109-110, Ex. P.)

---

[6]Design contends that this license is exclusive.  (Br. at 2.)  Plaintiffs underscore that the
license to MP Properties is not exclusive because it is not in writing, as 17 U.S.C. § 204 requires
for an exclusive license.  (*Id.*)  In any event, as Plaintiffs aptly note, the factual disputes
surrounding the license to MP Properties is not material for purposes of resolving the standing
issue.

Plaintiffs, in response, contend that Mayotte's grant of an exclusive license in the copyrighted materials to each Plaintiff, among others, constitutes the requisite exclusive license for purposes of copyright standing under § 501(b).  In support, Plaintiffs aptly note that the Copyright Act recognizes joint and exclusive ownership of the same bundle of rights. (Resp. to Design at 1, 6.) *See 1 Nimmer On Copyright* §§ 6.09, 6.10 (observing that federal copyright law treats joint owners as "tenants-in-common," with each owning an undivided interest in the whole copyright and with each entitled to exercise all of the exclusive rights of a copyright owner that § 106 sets forth); *Fantasy, Inc. v. Fogerty,* 654 F. Supp. 1129, 1130 (N.D. Cal. 1987) ("As joint owners of such exclusive rights as reproduction, preparation of derivative works, public performance, and distribution and sale, each co-owner has 'an independent right to use or license the use of the copyright.'") (citing *Oddo v. Ries,* 743 F.2d 630, 633 (9th Cir. 1984)); *Bridgeport Music, Inc. v. Dimension Films,* 230 F. Supp. 2d 830 (M.D. Tenn. 2002)(discussing the rights of co-ownership of copyright).  According to Plaintiffs, copyright law's recognition of joint ownership of exclusive rights demonstrates that § 501(b) does not withhold copyright standing when there is more than one licensee of an exclusive license. (Resp. to Design at 9.)

To find that a licensee of an exclusive license lacks copyright standing because the copyright owner also granted the exclusive license to one or more other licensees would, indeed, fly in the face of case law affirming the Copyright Act's recognition of joint ownership of exclusive rights.  Moreover, it would be tantamount to holding that copyright law gives such licensees rights without the necessary remedy for a violation of those rights.  Therefore, the Court finds that Plaintiffs have standing to assert their claims.

## B.  Copyright Infringement

A copyright owner has the exclusive right to reproduce the copyrighted work, to prepare derivative works based upon the copyrighted work, and to distribute copies of the work. *See* 17 U.S.C. §§ 106(1), (3). "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright." 17 U.S.C. § 501(a); *see Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 423-433 (1984). To establish a claim of copyright infringement, a plaintiff must show: 1) that he owns a valid copyrighted work; and 2) that the defendant copied protected elements of that work. *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 387 F.3d 522, 534 (6th Cir. 2004). "If no direct evidence of copying is available, a claimant may establish th[e] [second] element by showing that the defendant had access to the copyrighted work and that the copyrighted work and the allegedly copied work are substantially similar." *Id.*

Gateway and Design argue that Plaintiffs, as a matter of law, have failed to demonstrate that Defendants, via the Gateway Oaks plans, infringed the Knollwood building design, as embodied in the Knollwood plans and their derivative works. (Design Mot. at 2, Br. at 11; Gateway Br. at 15.) According to Design, Brian Gill ("Gill") of Design designed Gateway Oaks, and he did so independently and without any access to the Knollwood plans or their derivative works. (Design Br. at 3; Gill Dep. at 41-42, 79, Ex. K) Here, Plaintiffs rely upon circumstantial evidence to demonstrate Defendants' alleged copyright infringement.[7]

### 1. Access

---

[7]Defendants underscore that Plaintiffs lack any direct evidence of copyright infringement. Specifically, Design and Gateway contend that none of the witnesses had personal knowledge that any of the Defendants copied the Knollwood or Aberdeen plans. (Design Br. at 12; Gill Dep. at 83, Ex. K; Moceri Dep. at 28, 33; Chirco Dep. at 63-64; Ex. U.)(Gateway Br. at 16, 18; Moceri 3/27/03 Dep. at 21-22, Ex. 9; Chirco 4/3/03 Dep. at 9, 11, Ex 11; J. Moceri 3/36/03 Dep. at 73; D'Angelo 8/6/03 Prelim. Inj. Tr. at 75.)

Gateway and Design contend that Plaintiffs, as a matter of law, have failed to show that Defendants had access to the Knollwood building design, as embodied in the Knollwood plans and their derivative works.  Plaintiffs, in turn, argue that they have presented sufficient evidence to raise a genuine issue of material fact that Defendants had such access. (Resp. to Design at 2-4.)

An opportunity to view the protected material constitutes the requisite access.  *Robert R. Jones Assoc.,* 858 F.2d at 277; 4 *Nimmer on Copyright* § 13.02[A].  A party may establish access by demonstrating that: 1) the copyrighted work had been widely disseminated; or 2) a particular chain of events occurred by which the alleged infringer might have gained access to the copyrighted work.  *Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 482 (9th Cir. 2000).

Design and Gateway contend that none of the witnesses had personal knowledge that Design, via Gill, or Gateway had access to the Knollwood or Aberdeen plans before the Gateway Oaks plans were created on November 9, 2000.  (Design Br. at 3, 12; Moceri Dep. at 33-35; Chirco Dep. at 63-64, 70-71, Exs. L & Test.)(Gateway Br. at 15-16; Moceri 3/27/03 Dep. at 64-65, Ex. 9.)  As Gateway notes, D'Angelo testified that he had never seen or inspected the Knollwood plans until after the commencement of this suit.  (Gateway Br. at 16; 8/6/03 Prelim. Inj. Tr. at 75, 84-85, Tab 17.)

As Plaintiffs note, however, Moceri averred that the Aberdeen plans were on file with the Shelby Township Building Department and, as such, were publicly available.  (Moceri Aff. at ¶ 47; Resp. to Design at 4.)  Moceri further averred that Plaintiffs advertised their condominiums in a variety of sources, including the Sunday newspapers and the Internet, and that those sources, especially the Internet, contained detailed drawings of the Knollwood building design.  (Resp. to

13

Design/Gateway at 4; Moceri Aff. at ¶¶ 20-21, 45.)

In any event, Plaintiffs principally contend that Defendants copied the Knollwood building design from the Aberdeen Pines and Gardens plans or buildings, which embody that design, rather than from the Knollwood plans or the Aberdeen (Village) plans or buildings, the copyrights allegedly infringed.  (*See* Merz Dep. at 57-58, Design Ex. J.) (testifying that all of the Aberdeen projects embody the Knollwood building design).  Gateway challenges, without elaboration, Plaintiffs' reliance upon the other Aberdeen projects to show Defendants' access to the Knollwood building design. (Reply at 4.)  However, the Court, in its August 28, 2003, opinion found it proper to consider evidence of Defendants' access to the Knollwood building design via Aberdeen Pines and Gardens. (Opinion at 28 n.15.)  Indeed, "[o]ne who views a performance of a copyrighted work and copies expressions contained in that work may be found to have infringed" the underlying work.  *Twin Peaks Prods., Inc. v. Publications Int'l, LTD.,* 996 F.2d 1366 (2d Cir. 1993)(holding that the defendant's access to broadcast programs that "contained virtually all of the protected expression in the [allegedly-infringed] teleplays" serves "as the functional equivalent of access to the protectable content of the teleplays").

As to Defendants' alleged access to Aberdeen Pines, Plaintiffs point to the Declaration of Tom Wujczyk ("Wujczyk"), which demonstrates the following:  1) brochures for Aberdeen Pines, which included its building design, were distributed beginning in July of 2000; 2)  the first visitors to Aberdeen Pines arrived in July of 2000; 3) five units of Aberdeen Pines were sold by July 16, 2000; 4)  the Master Deed for Aberdeen Pines, which includes floor plans that MCS prepared, was recorded on August 23, 2000; 5)  the first building permit and Certificate of Occupancy for Aberdeen Pines were issued on November 15, 2000, and May 14, 2001,

14

respectively; 6) the Gateway Oaks plans were not created until long after Aberdeen Pines was constructed; and 7) by the time that Gateway Oaks received its first building permit on May 13, 2002, all 168 units of Aberdeen Pines were fully constructed and occupied. (Exs. A & B, Resp. to Design; Wujczyk Aff. at ¶¶ 7-8)(Resp. to Gateway at 2-4.) As Plaintiffs further underscore, Jack Nelson, D'Angelo's partner in Gateway Oaks, was the title agent for Aberdeen Pines and, as such, had direct access to its master deeds and other documents showing the Knollwood building design. (Resp. to Gateway at 2, 12; Deeds, Ex. B.) Concerning Aberdeen Gardens, in particular, Wujczk averred that construction on Aberdeen Gardens began in November of 1998, and that all 360 units of Aberdeen Gardens were fully constructed and occupied by May 13, 2002. (Wujczk Aff. at ¶¶ 5, 8.)

According to Plaintiffs, the master deeds for Aberdeen Pines and Gardens, both of which embody the Knollwood building design, were filed with the Macomb County Register of Deeds and, thus, were a matter of public record. (Resp. to Gateway at 2-3, 12.) Wujczk averred that MCS prepared the master deeds for Aberdeen Pines, Aberdeen Gardens, and Gateway Oaks, and that he provided MCS with construction drawings of Aberdeen Pines and Gardens so that MCS could prepare those deeds. (*Id.* at 12; Wujczk Aff. at ¶¶ 2-4.) Additionally, Plaintiffs argue that the Gateway Defendants' hiring of MCS and Hall, both of which had worked on Aberdeen Pines and Gardens, shows Defendants' intention to copy the Knollwood building design and "to achieve the economic advantage of using subcontractors who had already created and constructed the virtually identical Aberdeen projects." (Resp. to Design at 3; Resp. to Gateway at 4.)

Design and Gateway assert that there is insufficient evidence, as a matter of law, that

they had access to the Knollwood building design, as embodied in the Knollwood plans and their derivative works. (Design Reply at 5; Gateway Br. at 15.) Specifically, Design and Gateway contend that there is nothing but speculation to show that they possessed or viewed any plans embodying the Knollwood building design, and that such speculation is insufficient to rebut Gill's testimony that he independently created the Gateway Oaks plans. (Design Br. at 12; Reply at 5; Gill Dep. at 79, Ex. K; Gateway Br. at 15.) However, as recited above, Plaintiffs have presented much more evidence of access–i.e. a mere opportunity to view–than bare speculation.

Plaintiffs have created an issue of fact as to whether Defendants had access to the Knollwood building design, as embodied in the Knollwood plans and their derivative works. Of special note, in *Ronald Mayotte & Assoc. v. MGC Bldg. Co.,* 885 F. Supp. 148, 152 (E.D. Mich. 1994), Judge Nancy Edmunds found the requisite access to architectural plans based upon evidence that the defendant built the infringing development in the vicinity of the plaintiff's homes; that the plaintiff had distributed sales brochures containing their copyrighted designs; and that the plaintiff had submitted those designs to the City of Novi. *See also Robert R. Jones Assoc., Inc., v. Nino Homes,* 686 F. Supp. 160, 162 (E.D. Mich. 1987) (finding access to copyrighted floor plans where companies built homes in the same neighborhood and the plaintiff opened model homes for public viewing). As the Court noted in its August 28, 2003, opinion, the evidence then available, "taken as a whole, would be sufficient to create a[n] . . . issue of . . . fact [regarding Defendants' access] for purposes of a summary judgment motion." (Opinion at 28). The evidentiary landscape has not materially changed since that time.

### 2. Substantial Similarity to Protected Elements

16

"To demonstrate substantial similarity, a Plaintiff need not prove mindless, slavish, or inartful copying. Rather, substantial similarity exists if, comparing the allegedly infringing work to the copyrighted work, 'an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" *Arthur Rutenberg Homes, Inc. v. Maloney,* 891 F. Supp. 1560, 1567 (M.D. Fla. 1995); *see Kohus,* 328 F.3d at 855 (holding that substantial similarity does not require identity, and that it exists where the work is recognizable as having been taken from the copyrighted source).

Assuming *arguendo* that the Knollwood building design is protected, Gateway and Design maintain that Plaintiffs, as a matter of law, have failed to establish that the Gateway Oaks plans are substantially similar to that design, as embodied in the Knollwood plans and their derivative works. (Gateway Br. at iv.) Plaintiffs contend otherwise. (Resp. to Gateway at 2.)

Gateway contends that, because Johnson and Merz identified over 547 differences between the Aberdeen and Knollwood plans and the Gateway Oaks plans, those plans are not substantially similar. (Gateway Br. at 19; Johnson Report at 6-26, Ex. 26/B) However, as the Court, in its August 28, 2003, opinion, recognized:

> The differences within the units, such as changes in the location of the bedrooms, changes in the dimensions of the rooms, etc., are immaterial to whether the two buildings are substantially similar with respect to the overall arrangement of space. As noted in Nimmer on Copyright:
>
> > It is entirely immaterial that, in many respects, [the] plaintiffs' and [the] defendant's works are dissimilar, if in other respects, similarity as to a substantial element can be shown. 'No plagiarist can excuse the wrong by showing how much of his work he did not pirate.' If substantial similarity is found, the defendant will not be immunized from liability by reason of the addition in his work of different characters or additional and varied incidents, nor generally by reason of his work proving more attractive or saleable than the plaintiffs.

17

4 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON

COPYRIGHT § 13.03[B][1][a] (2003) (quoting *Sheldon v. Metro-Goldwyn*

*Pictures Corp.,* 81 F.2d 49 (2d Cir. 1936)(Hand. J.)).

Design and Gateway argue, with much effort, that Merz, Plaintiffs' expert, testified that,

in his opinion, Defendants did not copy, reproduce, or distribute the Knollwood or Aberdeen

plans. (Design Br. at 3; Merz Dep. at 99-101, Ex. J)(Gateway Br. at iv, 16; Merz Dep. at 44-45,

155-56, Ex 7).  In support, Gateway cites to the following excerpt from Merz's deposition

testimony:

> Q       . . . . Did you ever compare the drawings of the Gateway building
>         with the sheets of drawings of the Knollwood building on a sheet
>         by sheet basis to see whether Gateway reproduces . . . any of the
>         sheets of the Knollwood . . . drawings?
>
> A.      I looked at both projects and many more.  I did not do a sheet by sheet
>         comparison of any projects, not even the projects, the separate projects
>         generated by Moceri/Mayotte, nor do I think that's germane to my
>         opinion.  I have never contended that individual sheets were copied, in
>         fact that would be quite obvious, you know, what somebody was copying.
>         What I contend repeatedly is the design was designed early on by Mayotte
>         and Moceri, and[,] after that design came about[,] other developers started
>         using it and that–in light of that, the individual sheets of drawings were
>         not important to me and I had no opinion on that.  So you're asking me
>         repeatedly something that I cannot and will not testify to.  I just–it's not
>         germane to my opinion, it's not what I did.

(Merz 3/23/04 Dep. at 44-45, Ex. 7.)  According to Gateway, Merz further testified that, upon

comparing the sheets of the Knollwood or Aberdeen plans with the Gateway Oaks plans at his

deposition, he believed that they were not copies. (Gateway Br. at iv, 12 n.15; Merz Dep. at 139-

40, 147-48, 172, Ex. 7.)

This argument, however, mischaracterizes Merz's testimony.  While Merz testified, in

effect, that Defendants did not literally or slavishly copy the Knollwood or Aberdeen plans–i.e.

18

by Xeroxing the protected plans or tracing each line in them and treating the resulting product as

belonging to Gateway Oaks (Merz Dep. at 99-100, 133, 154)–Merz never wavered on his belief

that the Gateway Oaks plans copied the Knollwood building design, as embodied in the

Knollwood plans and their derivative works.  (Design Br. at 9; Merz Dep. at 69-72, 155-56, Ex.

J; Merz Rule 26 Report, Ex. Q). For example, Merz testified that the "similarities of the

dimensions of the footprints, it's way too close to start to say this was just totally independently

arrived at" (Merz Dep. at 98, Ex.J); that "the design idea is copied"  (*Id.* at 99.); and that the

"spacial arrangement . . . is a copy." (*Id.* at 99, 101-02).

 Gateway argues that a side-by-side comparison of the Knollwood and Gateway Oaks

plans reveal that no substantial similarity exists between them.  (Gateway Br. at 19; *see* Ex. 26/B

&D; Johnson Report 6-26, Ex. 26.)  Gateway notes that Design, via Gill, testified that it did not

reproduce, replicate, or distribute the Knollwood or Aberdeen plans.  (Gill Dep. at 88; Gateway

Br. at iv.)  Johnson, at the preliminary-injunction hearing, testified that the Gateway Oaks plans

were not a copy of the Knollwood and Aberdeen plans.  (Gateway Br. at 19; Prelim. Inj. Tr. at

134-49, Ex. 17).

 As Plaintiffs note, the Court, in its August 28, 2003, opinion, found the requisite

evidence of substantial similarity. (Resp. to Design at 13; Opinion at 30.)  Specifically, the Court

concluded:

> It cannot be doubted . . . that sufficient similarities exist between the two
> arrangements of space which requires submission of the case to the ultimate trier
> of fact.  An overlay of the Gateway Oaks building 'footprint' and the Aberdeen
> Village 'footprint' reveals that the overall building perimeters are quite similar.
> (Def.'s Resp. Br. Exh. 3 - Johnson Report Exh. X.)  More importantly, the overall
> arrangement of space is strikingly similar.  Both buildings contain twelve units
> that are efficiently divided into four identical fire rated quadrants without the use
> of a common hallway.  Each individual unit, as a whole, is positioned within the

19

overall complex in virtually the same manner. This positioning allows each unit in both buildings to have direct access to the occupant's garage.

At the same time, one of the more important features of Plaintiffs' arrangement of space is noticeably absent from the Gateway Oaks arrangement of space. The Knollwood and Aberdeen Village developments have six single-car garages located at the end of the building. The positioning of all of the garages at the end of the building facilitated two of the more important, and more original, features of Plaintiffs' arrangement of space – (1) the architecturally identical nature of the front and back of Plaintiffs' buildings which created an attractive visual appeal; and (2) the building's ability to efficiently occupy a site because the garages of adjoining buildings would face each other, allowing for a compact driveway orientation between two buildings. (Moceri Affidavit ¶'s 9-10.) The Gateway Oaks building, on the other hand, lacks this critical arrangement of space. The Gateway Oaks building has four garages positioned in the front. As such, the front and back of the Gateway Oaks building are not architecturally identical, an important distinction.

(August 28, 2003, Opinion at 32-33.) While this reasoning does not constitute the law of the case, it is persuasive as the evidentiary background upon which it rests has not materially changed. Thus, Plaintiffs have created an issue of fact as to whether the Gateway Oaks plans are substantially similar to the Knollwood building design, as embodied in the Knollwood plans and their derivative works.

The record evidence, when viewed in Plaintiffs' favor, creates issues of fact as to whether Defendants had access to the Knollwood building design, as embodied in the Knollwood plans and their derivative works, and as to whether the Gateway Oaks plans are substantially similar to that design. However, as discussed below, Plaintiffs' claims fail as a matter of law for another reason.

## C. Copyright Protection for the Knollwood Building Design

Gateway and Design contend that the "Knollwood building design"–the arrangement of space–is not entitled to copyright protection on three principal grounds.

20

## 1.  The AWCPA

Design contends that the Knollwood building design, as embodied in the Knollwood plans and their derivative works, is not entitled to copyright protection because the Knollwood plans and buildings, both of which embody that design, were constructed and published, respectively, before December 1, 1990, the effective date of the AWCPA. (Design Mot. at 1, Br. at 2-3, 7; Reply at 2-4; Ex. F & G.)  Design asserts that, regardless of whether it is embodied in plans or buildings, a design of a building–defined as an "architectural work" under the AWCPA–may be copyrighted only if, pursuant to the AWCPA, it was published or constructed after December 1, 1990.[8]  (Design Br. at 7-8; Reply at 2-4.)  Design further asserts that, even though the Knollwood plans–created before December 1, 1990–and the Aberdeen plans and buildings–created after December 1, 1990–embody the Knollwood building design, that design was and always will be in the public domain by virtue of its having been published or constructed before December 1, 1990.  (Design Mot. at 1-2; Reply at 2-4.)  According to Design, only the AWCPA affords copyright protection to building designs.  (Design Br. at 8; Reply at 4.)

Plaintiffs, in response, rely upon the arguments that they set forth in their pleadings on their re-filed motion.  (Resp. to Design at 1, 10-12.)  Specifically, Plaintiffs assert that, as a matter of law, the building design of the copyright-protected Knollwood plans is not in the

---

[8]*See* 37 C.F.R. 202.11 (d)(3) (excluding from registration as an architectural work "[t]he design of buildings where the plans or drawings of the buildings were published before December 1, 1990 or the buildings were constructed or otherwise published before December 1, 1990"); 37 C.F.R. 202.11 (c)(5) ("Publication of an architectural work occurs when underlying plans . . . of the building or other copies of the building design are distributed or made available to the general public by sale or other transfer of ownership or by rental, lease or lending. Construction of a building does not itself constitute publication for purposes of registration unless multiple copies are constructed.)

21

public domain by virtue of having been built in buildings falling outside the AWCPA.  (Re-filed Mot. at 1; Br. at 1.)  According to Plaintiffs, the Knollwood buildings, like the Aberdeen plans and buildings, are derivatives of the Knollwood plans, the original copyrighted material.[9]  (Re-filed Br. at 1; *See* August 28, 2003, Opinion at 22-23.)  Plaintiffs argue that the absence of copyright protection for derivative buildings under the AWCPA does not negate the validity of the copyright in the underlying plans or, as Defendants contend, turn the building design in the protected plans over to the public domain. (Re-filed Br. at 1-7.)  Plaintiffs underscore that the Court's August 28, 2003, opinion and order denying Plaintiffs' motion for a preliminary injunction held as much and, thus, forecloses Defendants' continued reliance upon any such legal defense.  (Re-filed Br. at 1.)

Plaintiffs are correct.  As the Court found in its August 29, 2005, opinion granting Plaintiffs' re-filed motion, the Court's August 28, 2003, opinion, the complete reasoning of which the Court will not belabor by repeating, makes clear that "the Knollwood building design receives copyright protection by virtue of the copyright protection of the Knollwood plans,

---

[9]Gateway asserts that Plaintiffs' continued contention that the Knollwood buildings are derivatives of the Knollwood plans lacks any factual or evidentiary basis.(Resp. at 4. n. 9.)  Specifically, Gateway argues that the Knollwood buildings' registration does not indicate that they are such derivative works. (*Id.* at 4-5 n.9, 11.)  *See* 17 U.S.C. § 109 (providing that the application for copyright registration should include, "if the work has been published, the date and identification of its first publication" and, if the work is derivative, "an identification of any pre-existing work . . . that it incorporates, and a brief, general statement of the additional material covered by the copyright being registered").

Yet, to remedy this defect in the initial registrations, supplemental registrations, filed in October of 2001, identified the Aberdeen copyrights as derivatives of the Knollwood plans.  (Compl. Ex. A., U.S. Copyright Registrations No. VAu 535-027 and VAu 535-028); *Chirco v. Hampton Ridge, L.L.C.*, No. 01-72015, at 15 (E.D. Mich. Sept. 24, 2002) (Order Adopting in Part and Denying in Part the Report and Recommendation of the Magistrate Judge).  Moreover, Gateway cannot plausibly argue that the construction of the Knollwood buildings preceded the plans for such construction.

which embody the building design, as a 'pictorial, graphic, or sculptural work' under 17 U.S.C. § 102(a)(5), which separate copyright protection the AWCPA leaves intact."[10]  (April 29, 2005, Opinion at 14.)  Neither a change in intervening law nor any arguments in Design's pleadings repudiate this legal conclusion or counsel against applying it as the law of the case.  Design cites no legal authority dictating otherwise.

The Court wishes to underscore, however, the limited scope of protection that the Knollwood plans–and, thus, the Knollwood building design that they embody–receive as "pictorial, graphic, or sculptural" works under 17 U.S.C. § 102(a)(5).  Although one properly could construct a building that is identical to the building depicted in the Knollwood plans, one could not directly copy those plans–in whole or in part–and then use the infringing copy to construct a building.  *See Robert R. Jones, Assoc.,* 858 F.2d at 280; *Imperial Homes Corp.,* 458 F.2d at 899.  Moreover, if one were to have made infringing copies of the Knollwood plans, the recoverable damages would include any losses stemming from the subsequent use of those infringing copies, such as by constructing a building based upon them.  *See Robert R. Jones, Assoc.,* 858 F.2d at 280.

### 2.  Ideas Versus Expression of Ideas

Gateway and Design cursorily argue that the Knollwood building design is in the public domain because it consists of unprotected ideas rather than the protected expression of ideas.  *See Nino Homes,* 858 F.2d at 277 ("Copyright protects only the work's particular expression of

---

[10]On May 13, 2005, all of the Defendants except Design filed a motion for reconsideration of the Court's April 29, 2005, ruling.  The Court, however, concludes that they are not entitled to relief under Eastern District of Michigan Local Rule 7.1(g).  Accordingly, the Court DENIES Defendants' motion for reconsideration.

an idea, not the idea itself.")(internal quotation marks omitted).  (Design Br. at 3, 11; Merz Dep.

at 78-80, 83-84, 88; Chirco Dep. at 57-58, Moceri Dep. at 79-80, Exs. J & M.) (Gateway Br. at

12, Reply at 1.)  However, the Court, in its August 28, 2003, opinion clearly rejected such an

assertion.  (Opinion at 16.)  As the Court reasoned, in pertinent part:

> . . . Plaintiffs do not seek a monopoly in the individual ideas contained in their
> copyrighted architectural plans and works.  Instead, . . . [they seek] to protect the
> original expression of these architectural features in the combined arrangement of
> space expressed in the copyrighted material . . . .
>
> This protection, therefore, would not prevent a third-party, such as the Defendants
> in this case, from independently creating their own architectural plans based upon
> general abstract ideas circulating in the architectural community (such as locating
> single car garages on each side of a building so [that] each occupant will have
> direct access to their own garage).  Instead, copyright protection of the
> architectural plans (expression) merely prohibits a third-party, as Plaintiffs allege
> in this case, from simply copying another's copyrighted original expression in
> order to avoid the time and expense of independently creating their own original
> expression based upon abstract ideas.

(August 28, 2003, Opinion at 16-18.)  Neither a change in intervening law nor any arguments or

evidence set forth in Gateway's or Design's pleadings negate this holding or counsel against

applying it as the law of the case.

### 3.  Originality

Gateway argues that the Knollwood building design, as embodied in the Knollwood plans

and their derivative works, is unprotected because it is not original to Mayotte, its alleged

creator. (Gateway Br. at 12 n.16, 13; Reply at 3-4.)  "The *sine qua non* of copyright is

originality."  *Feist Publ'n Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991). In the context

of copyright law, originality only means "that the work was independently created by the author

(as opposed to copied from other works), and that it possesses at least some minimal degree of

creativity."  *Id.*

24

As discussed previously, the Knollwood building design is a twelve-unit structure whose first floor consists of four units and two rows of six single-car garages at each end and whose second floor consists of eight units, four of which are over the garages. (Merz Aff. at ¶¶ 8-10.) Each of the second-floor units that are over the garages are placed on three such garages so that the building consists of four distinct quadrangles with fire rated walls separating each quadrangle. (*Id.*) Each of the twelve units has direct access to its assigned garage. (*Id.*)

Gateway asserts that Mayotte copied the Knollwood building design from one or more of three pre-existing sources of that design. (Gateway Br. at 13-14; Reply at 4.) As Douglas A. Johnson ("Johnson") averred, the Glenns of Bloomfield ("the Glenns") is an eight-unit apartment building, constructed in 1966, that includes "garages on the outer ends of each building, with carriage units over the garages." (Johnson Supp. Aff. at ¶¶ 15-16.) According to Johnson, the Glenns is located eight miles from Mayotte's office and is visible from its major crossroads. (*Id.* at ¶ 15.) Johnson further averred that Maple Place, constructed between 1983 and 1984, is an eight-unit condominium building that consists of four units on each floor; four garages on each end of the building with each garage having direct access to its assigned unit; stacked ranches with back-to-back layouts; and the quadrant design. (Gateway Br. at 13; Johnson Aff. at ¶¶ 5-8.) According to Johnson, Maple Place is located thirteen miles from Mayotte's office and is readily visible from one of its major crossroads. (Johnson Aff. at ¶¶ 4, 14.) Johnson averred that Mayotte's draftsman, Lanny Galyon, inspected Maple Place before creating the Knollwood plans. (*Id.*)

Noting that the Knollwood building design includes two additional units above the garages on each end of the building to create a twelve-unit structure, Johnson averred, however,

25

that Huntington Park, along with the Glenns, contained such above-garage units.  (Johnson Aff.

at ¶¶ 5, 14.)  According to Johnson, Huntington Park, constructed in 1986, is a ten-unit building

that consists of stacked ranches; garages at each end of the building with each garage having

direct access to its assigned unit; and carriage units above the garages.  (*Id.* at ¶ 12.)  Johnson

further averred that Huntington Park is located three miles from Plaintiff Moceri's office, and

that Plaintiffs, as they testified, saw that structure before designing the Knollwood buildings.

(*Id.* at ¶ 11.)

In response, Plaintiffs simply assert that Merz's affidavit and his testimony at the

preliminary-injunction hearing, which the Court cited in its August 28, 2003, opinion, create a

genuine issue of material fact as to whether the Knollwood building design was original to

Mayotte. (Resp. to Gateway at 10).  At the hearing, Merz testified that, upon viewing the plans in

their entirety:

> I was hit by a eureka kind of moment, because what jumped off of all the projects
> at me was the arrangement of spaces, the design that put six garages on end of the
> rectangular building with . . . four first floor units between and eight above, and
> the quality that this involved, I have never seen before, that each had a separate
> front entrance, but also had direct access to the garage, and that the configuration
> design of the overall building, not where windows are, not where bathrooms are,
> stairs, but the overall design.  It is so compacted, so efficient, had such nice
> features, that you could evolve a whole series of designs out of it . . . I could take
> or any competent architect could take it and design it to be a black forest tudor, or
> cotswold cottage, or some of the things that we have seen here.  What I found of
> value, what I found to be distinctive in this design was the spacial arrangements
> of these units in the garage, which were very attractive and compact, they [] have
> a whole bunch of other possibilities, density on site, part like spaces out of the
> windows, et cetera.  A very economical roadway available with the design.

(Prelim. Inj. Tr. at 181-82.)

As Gateway aptly argues, Merz's testimony as to his opinion of the originality of the

Knollwood building design–i.e. that he had never seen such a design before–is insufficient to

26

rebut Defendants' evidence of Mayotte's copying of that design from at least one of three pre-existing sources. (Gateway Br. at 12 n.16.) Indeed, Merz testified that, although he was not aware of any pre-existing sources of the Knollwood building design, he was not in a "position to say that" such sources did not exist. (Merz Dep. at 65.) Moreover, Merz testified that he never asked Mayotte whether the design was original to him. (Gateway Br. at 12 n.16; Merz Dep. at 61, 138.)

Taking a different tack, Plaintiffs contend that the Court's August 28, 2003, opinion finding that the "overall combination of features, taken as a whole, constituted an original arrangement of space" is controlling here. (Opinion at 31; Resp. to Gateway at 10.) However, the issue of whether that arrangement of space was original to Mayotte was not before the Court at that time.

The Court concludes that Plaintiffs have failed to designate any record evidence that would create a genuine issue of material fact as to whether Mayotte independently created the Knollwood building design, as embodied in the Knollwood plans and their derivative works. Because Plaintiffs have failed, as a matter of law, to establish that such a design is entitled to copyright protection, Plaintiffs' claims of direct and indirect copyright infringement based upon that design necessarily fail. *See Bridgeport Music Inc. v. Diamond Time, Ltd.,* 371 F.3d 883 (6th Cir. 2004) (holding that contributory copyright infringement cannot exist absent direct copyright infringement.)

### III. SUMMARY

For the preceding reasons, the Court GRANTS Defendants' motions for summary-

27

judgment on all of Plaintiffs' claims.[11]


SO ORDERED.




s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  August 26, 2005

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on
August 26, 2005.



s/Jonie Parker
Case Manager

---

[11]On May 13, 2005, all of the Defendants except for Design filed a Petition under 28 U.S.C. §
1292(b) to Appeal the Court's April 29, 2005, Opinion and Order.  The Court denies this petition
as moot.